ORAL ARGUMENT NOT YET SCHEDULED

No. 24-3044

# In the United States Court of Appeals for the District of Columbia Circuit

———————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*

v.

KEITH BERMAN,

*Defendant-Appellant*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
D. CT. NO. 1:20-CR-00278 (MCFADDEN, J.)

———————

CORRECTED APPELLEE'S BRIEF FOR THE UNITED STATES

———————

BRENT S. WIBLE
Principal Deputy Assistant
Attorney General

JEREMY R. SANDERS
Assistant Chief &
Appellate Counsel
Criminal Division,
Fraud Section

LISA H. MILLER
Deputy Assistant Attorney
General

ETHAN A. SACHS
Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 353-1028
Ethan.Sachs@usdoj.gov

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Cir. R. 28(a)(1), the undersigned certifies as follows:

**A.     Parties and Amici**

The parties that appeared in the district court and that are now before this Court are the United States (appellee) and Keith Berman (defendant-appellant).  There are no amici curiae or intervenors.

**B.     Rulings Under Review**

Berman seeks review of the district court's (McFadden, J.) judgment imposing a sentence of 84 months' imprisonment.  A35-36.

**C.     Related Cases**

This case has not previously been before this Court or any other court.

s/ Ethan A. Sachs
ETHAN A. SACHS
Appellate Section
Criminal Division
U.S. Department of Justice

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............................................................................................................ i

TABLE OF AUTHORITIES .................................................................... v

GLOSSARY OF ABBREVIATIONS ...................................................... ix

INTRODUCTION ..................................................................................... 1

STATEMENT OF THE ISSUES ............................................................. 2

STATEMENT OF STATUTES AND REGULATIONS ...................... 2

STATEMENT OF THE CASE ................................................................ 2

    I. Statement of Facts ....................................................................... 3

        A.    Berman devises a false story ..................................... 3

        B.    The SEC begins investigating DECN, but Berman continues his fraud by undermining the investigation ......... 6

        C.    Berman is indicted ...................................................... 9

        D.    Berman pleads guilty and is sentenced ................. 10

SUMMARY OF ARGUMENT ............................................................... 16

ARGUMENT ............................................................................................ 18

    I.    The District Court Correctly Estimated the Amount of Loss ............................................................................................. 18

        A.    Standard of Review .................................................. 19

        B.    Relevant Authority ................................................... 20

        C.    The District Court Did Not Err in Determining That Berman's Fraud Had Been Disclosed by the Indictment ................................................................. 22

1.    The court appropriately adjudicated the battle of the experts at sentencing. ........................................ 22

2.    Berman fails to meaningfully contest the district court's factual determinations. .................................... 29

3.    Berman has identified no legal error in the district court's application of the Sentencing Guidelines ........................................................................ 31

II.    The District Court's Loss Determination Was Supported By Sufficient Evidence ........................................................ 37

A.    Standard of Review ................................................. 37

B.    Relevant Authority ................................................. 38

C.    The Government Introduced Sufficient Evidence to Support the District Court's Loss Calculation ................... 40

1.    Abundant direct and circumstantial evidence established causation. ................................................... 40

2.    Berman's cited authority is inapposite and, to the extent relevant, does not help him. ...................... 43

3.    Victims' statements demonstrated that Berman's fraud caused the substantial hardship. ......................................................... 48

III.    Berman's Sentence Was Substantively Reasonable ..................... 49

A.    Standard of Review ................................................. 49

B.    The Sentence was Substantively Reasonable Under the Guidelines Range that the Court Calculated ............... 50

C.    Even if Berman is Correct About the Applicable Guidelines Range, the Court Would Still Have Imposed the Same Substantively Reasonable Sentence ..................................................... 51

1.     The district court made clear at sentencing that it would impose the same custodial term for Berman's conduct if it made an error in the loss calculation. ...................................................................... 51

2.     Berman's term of 84 months' imprisonment would have been substantively reasonable even under the lower Guidelines range he urges .............. 54

CONCLUSION ........................................................................................... 57

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*City of Waukesha v. E.P.A.*,
320 F.3d 228 (D.C. Cir. 2003) ........................................................... 30

*Cooper v. Harris*,
581 U.S. 285 (2017) ........................................................................... 19

*Gall v. United States*,
552 U.S. 38 (2007) ........................................................................ 50, 54

*Glossip v. Gross*,
576 U.S. 863 (2015) ........................................................................... 19

*Greer v. United States*,
593 U.S. 503 (2021) ........................................................................... 20

*Holguin-Hernandez v. United States*,
589 U.S. 169 (2020) ........................................................................... 35

*In re Sealed Case*,
809 F.3d 672 (D.C. Cir. 2016) ........................................................... 54

*United States v. 269 Acres, More or Less, Located in Beaufort Cnty., S.C.*,
995 F.3d 152 (4th Cir. 2021) ............................................................. 27

*United States v. Bazemore*,
839 F.3d 379 (5th Cir. 2016) ............................................................. 38

*United States v. Berger*,
587 F.3d 1038 (9th Cir. 2009) ..................................................... 39, 46

*United States v. Bolla*,
346 F.3d 1148 (D.C. Cir. 2003) ......................................................... 20

*United States v. Bras*,
483 F.3d 103 (D.C. Cir. 2007) ............................................... 22, 23, 29

*United States v. Brown,*
   595 F.3d 498 (3d Cir. 2010).................................................................39

*United States v. Edwards,*
   496 F.3d 677 (D.C. Cir. 2007)..............................................................19

*United States v. Ferguson,*
   584 F. Supp. 2d 447 (D. Conn. 2008)...................................................34

*United States v. Gardellini,*
   545 F.3d 1089 (D.C. Cir. 2008)......................................... 49, 50, 55, 56

*United States v. George,*
   403 F.3d 470 (7th Cir. 2005) ...............................................................51

*United States v. Hallford,*
   756 F. App'x 1 (D.C. Cir. 2018)...........................................................19

*United States v. Hart,*
   324 F.3d 740 (D.C. Cir. 2003)..............................................................27

*United States v. Herman,*
   No. 22-8057, 2023 WL 6861766 (10th Cir. Oct. 18, 2023) ...............46

*United States v. Hunter,*
   809 F.3d 677 (D.C. Cir. 2016)..............................................................20

*United States v. Leonzo,*
   50 F.3d 1086 (D.C. Cir. 1995)..............................................................19

*United States v. Mack,*
   841 F.3d 514 (D.C. Cir. 2016)........................................................37, 53

*United States v. Martinez,*
   821 F.3d 984 (8th Cir. 2016) ...............................................................56

*United States v. McCants,*
   554 F.3d 155 (D.C. Cir. 2009)..............................................................20

*United States v. McIlwain,*
    931 F.3d 1176 (D.C. Cir. 2019) ............................................................. 52

*United States v. Mejia,*
    597 F.3d 1329 (D.C. Cir. 2010) ............................................................. 50

*United States v. Miller,*
    35 F.4th 807 (D.C. Cir. 2022) ............................................................... 55

*United States v. Peppel,*
    707 F.3d 627 (6th Cir. 2013) ................................................................ 38

*United States v. Peppel,*
    No. 06-cr-196, 2011 WL 3608139 (S.D. Ohio Aug. 16, 2011) ........................ 33

*United States v. Roach,*
    896 F.3d 1185 (10th Cir. 2018) ............................................................. 35

*United States v. Salmon,*
    948 F.2d 776 (D.C. Cir. 1991) .............................................................. 37

*United States v. Seabrook,*
    968 F.3d 224 (2d Cir. 2020) ................................................................. 56

*United States v. Shah,*
    453 F.3d 520 (D.C. Cir. 2006) .............................................................. 38

*United States v. Stein,*
    846 F.3d 1135 (11th Cir. 2017) .............................................. 43, 44, 45, 46, 47

*United States v. Stein,*
    964 F.3d 1313 (11th Cir. 2020) ............................................................. 47

*United States v. Stevens,*
    105 F.4th 473 (D.C. Cir. 2024) ............................................................. 20

*United States v. Thomas,*
    114 F.3d 228 (D.C. Cir. 1997) .............................................................. 38

*United States v. Tolbert,*
    482 F. App'x 507 (11th Cir. 2012) ........................................................56

*United States v. Washington,*
    115 F.3d 1008 (D.C. Cir. 1997) ..........................................................37

*United States v. Williamson,*
    903 F.3d 124 (D.C. Cir. 2018) ............................................................49

*Williams v. United States,*
    503 U.S. 193 (1992) ...........................................................................52

**Statutes and Rules**

17 C.F.R. § 240.10b-5 .............................................................................2, 9

15 U.S.C. 78ff ..........................................................................................2, 9

15 U.S.C. 78j ...........................................................................................2, 9

18 U.S.C. 1001 ............................................................................................9

18 U.S.C. 1343 .......................................................................................2, 10

18 U.S.C. 1505 .......................................................................................2, 10

18 U.S.C. 3553 ......................................................................................54, 55

U.S.S.G. § 2B1.1 ........................................... 11, 15, 16, 19, 20, 21, 25, 31, 38, 39, 40

U.S.S.G. App. C, Volume 2, Amendment 617 (Nov. 1, 2001) ...........................38

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| A | Appellant's appendix |
| Br. | Appellant's opening brief |
| DECN | Decision Diagnostics Corp. |
| FDA | Food and Drug Administration |
| PSR | Presentence Investigation Report |
| SA | Appellee's supplemental appendix |
| SEC | Securities and Exchange Commission |
| U.S.S.G. | United States Sentencing Commission, *Guidelines Manual* (Nov. 2024) |

**INTRODUCTION**

At the outset of the COVID-19 pandemic, Keith Berman, then-CEO of medical-device company Decision Diagnostics Corp. (DECN), issued public statements claiming that DECN had created a test that could detect the novel coronavirus.  Those statements, which Berman knew to be false, caused DECN's stock price to soar.  They also prompted the Securities and Exchange Commission (SEC) to launch an investigation of DECN, which Berman took elaborate measures to obstruct.  For months, Berman sowed sufficient public doubt in the SEC's conduct that investors continued purchasing DECN stock at inflated prices.  Eventually, however, his scheme came to an end in December 2020, when a federal grand jury returned an indictment charging him with securities fraud and other offenses.

Berman pleaded guilty and was sentenced to 84 months' imprisonment.  On appeal, he raises three principal contentions regarding his sentence:  (1) that the district court erred in estimating the amount of loss involved in his offense; (2) that the loss estimation was supported by insufficient evidence; and (3) that his sentence was substantively unreasonable.  Because those claims, which are based either on mis-readings of the record or inapposite authority, uniformly lack merit, Berman's sentence should be affirmed.

## STATEMENT OF THE ISSUES

1.  Whether the district court clearly erred in estimating that Berman's offense involved approximately $28 million in loss.

2.  Whether the government offered sufficient evidence to support the district court's loss determination.

3.  Whether Berman's sentence of 84 months' imprisonment was substantively unreasonable.

## STATEMENT OF STATUTES AND REGULATIONS

All pertinent statutes and regulations are produced in the addendum to Berman's brief.

## STATEMENT OF THE CASE

Following a guilty plea, defendant-appellant Keith Berman was convicted on one count of securities fraud, in violation of 15 U.S.C. 78j & 78ff and 17 C.F.R. § 240.10b-5; one count of wire fraud, in violation of 18 U.S.C. 1343; and one count of obstructing an SEC proceeding, in violation of in violation of 18 U.S.C. 1505. A574. He was sentenced to 84 months in prison, to be followed by three years of supervised release.

## I.    Statement of Facts

### A.    Berman devises a false story

Berman was the Chief Executive Officer and sole director of DECN, a publicly traded medical-device company based in California.  A427.  DECN developed and sold kits that tested blood-sugar levels of diabetic patients through a technology called impedance.  A427.

In the early months of 2020, Berman and DECN faced, as Berman put it privately, a "perilous" financial "situation."  A428.  Unbeknownst to the public, Berman had spent close to $650,000 of DECN's money on personal expenses, and the company struggled to pay its bills, including to its Korean partner, The Bio, which manufactured its blood-testing devices.  A428; SA178-190.

In the face of this financial turmoil, Berman concocted a "new story" that he believed would "allow [him] to raise millions" of dollars.  A428.  Specifically, on February 28 and 29, Berman e-mailed The Bio proposing to use impedance technology to detect the novel coronavirus that was beginning to spread around the world and would come to be known as COVID-19.  SA178.  In response, The Bio told Berman that although impedance may theoretically be able to detect a coronavirus, it doubted that an impedance-based product could

ever work as theorized or be produced on a commercial scale. SA178; A428. Undeterred, Berman instructed The Bio's owner, Daniel Kim, to "put together" "a development plan" for an impedance-based COVID-19 test "in 120 days." SA178. In e-mails to Kim, Berman made his motivation clear: "a screening tool for Corona Virus," "my how profitable it will be"; "this coronavirus through impedance is the story that will allow me to raise millions"; and "$3.99 per test strip, vials of 10 test strips … $$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$." A428; SA178-179.

The next day, under an alias, Berman engaged in private conversations in which he described a plan to "pump" DECN's stock price through press releases. SA11, SA162. In Berman's words, "[d]esperate times sometimes call for desperate measures." SA164.

Two days later, Berman began issuing press releases claiming that DECN had invented and perfected a finger-stick blood test that could detect COVID-19, even though he knew that to be untrue. A428. In the first press release, DECN "announc[ed]" "a break-through": the "introduction," "expected in the next 10 days," "of [a] new screening methodology for the Coronavirus (Covid19)." A238-239. "Our product," the release stated, "is timely, simple to use, cost effective and will be commercial ready in the

4

summer of 2020." A239.  In Berman's personal voice, the statement continued: "I want to say straight on that we have developed a Coronavirus screening method," and "[w]e have the technology perfected which will take months off of the development schedule. … Our timing here is spot-on." A239-240.  In the weeks that followed, Berman issued similar press releases, claiming that DECN's COVID-19 test kits would provide results "in 15 seconds, based on a small finger prick blood sample," and that DECN expected to sell 525 million test kits in the first year of production.  A260.

Berman also issued press releases and public disclosures that falsely claimed DECN was making substantial progress toward obtaining permission from the Food and Drug Administration (FDA) to offer its COVID-19 test under the agency's emergency use authorization authority.  A48.  In particular, Berman publicly claimed that DECN was nearing completion of all "testing required to receive" such authorization when in reality DECN "had conducted no [such] testing whatsoever." A50.

As Berman issued the false press releases and public statements, he knew that his claims were not true.  In private e-mails he sent to a friend over the same period, Berman admitted that DECN's tests could not identify the presence of SARS-CoV-2. *See* SA202 (acknowledging that DECN's tests could

generally detect flus and viruses but could not "distinguish between the common types of flu"); SA199 (recognizing that DECN's "method will not be specific enough to tell anyone which … flu[] has been detected.").

For months, Berman's actions brought their intended result. By April 2020, DECN's stock price had skyrocketed over 1,500%. A428. That success allowed the company to issue additional shares to the market, whose sale provided DECN and Berman with the money they needed. SA11.

## B.    The SEC begins investigating DECN, but Berman continues his fraud by undermining the investigation

Berman's statements ultimately drew the attention of the SEC. On April 23, the SEC announced that it was investigating DECN, and that trading of the company's stock would be suspended for ten days "because of questions regarding the accuracy and adequacy of information" in DECN's recent press releases. A260.

In early May, Berman petitioned the SEC to terminate DECN's suspension. A368. The petition included a sworn statement from Berman denying all allegations of wrongdoing and asserting that DECN's press releases had been true and not misleading. SA9-26, SA134-148; A367-369. In response to Berman's petition, the SEC ordered its Division of Enforcement to set forth substantive facts supporting DECN's suspension. The Division of

6

Enforcement filed such a declaration later in May, A263-274, and Berman subsequently submitted a second petition further denying all allegations of wrongdoing and accusing the SEC of conducting a "twisted and misleading investigation." A376-379. In a further effort to push back against the SEC's investigation, Berman publicized his official SEC submissions, posting them on a popular online penny-stock platform, www.OTCmarkets.com. SA18, SA170-171.

Alongside his official efforts to end the SEC's investigation, Berman undertook an "extraordinary" clandestine campaign to "sow confusion in the investing public, undermine the efficacy of the SEC notices," and "induce[] investors to ignore the" investigation and "keep buying" DECN stock. A511. During the spring and summer of 2020, Berman posted over 1,000 comments to an online investor message board (www.investorshub.com) under the alias "plutoniumimplosion." A51-52. Among other things, those messages praised DECN's business operations, refuted allegations that Berman had made false statements, and threatened and intimidated individuals who had approached the SEC regarding DECN. A52-53. Berman even implied that law enforcement "would show up at the homes of the individuals who had

complained about DECN and arrest them," warning them repeatedly of "knock knock day." A52-53.

Moreover, while pretending to be an independent DECN shareholder named "Matthew Steinmann," Berman befriended a real DECN shareholder M.C. and tricked him into helping Berman draft a letter accusing the SEC of investigatory misconduct. A429; SA12, SA172-177. The letter also warned that the SEC's investigation and suspension of DECN would damage "humanity … with respect to the … emergency use authorization of [DECN's] products to assist in the detection of the deadly Coronavirus." A54. Berman convinced dozens of real DECN shareholders to sign the letter, and he persuaded M.C. to send the SEC two additional letters on behalf of hundreds of "concerned and adversely impacted [DECN] shareholders," both of which accused the SEC of additional wrongdoing. SA206. Seeking maximum visibility for the letters, Berman also posted them publicly on OTCmarkets.com. SA342-343.

Berman's fraudulent statements continued through the summer of 2020. In July, for example, DECN released a statement falsely claiming that its COVID-19 "finger stick kits" were functional and "currently producing results at :10.5 seconds." A243-244. In October, Berman met with SEC investigators

and lied to them while under oath.  A429; SA2-8.  Later that month, Berman

agreed to an interview with two FBI agents and lied to them as well.  A429;

SA364-366.

### C.    Berman is indicted

In December 2020, a federal grand jury in the District of Columbia

returned an indictment charging Berman with one count of securities fraud, in

violation of 15 U.S.C. 78j & 78ff and 17 C.F.R. § 240.10b-5; and one count of

making false statements before the SEC, in violation of 18 U.S.C. 1001.  A41-

59.  The indictment, which was unsealed on December 18, alleged that, "[f]rom

at least in or around February 2020 through in or around December 2020,"

Berman defrauded DECN's investors by artificially increasing the company's

stock price.  A56.  In describing the particular acts Berman had taken in

furtherance of his fraudulent scheme, the indictment detailed the false

statements and press releases regarding DECN's test kits that Berman had

issued between March and April 2020, A45-47; the false statements and press

releases Berman had issued "[t]hroughout 2020" regarding the progress of

DECN's emergency use authorization application with the FDA, A48-51; the

secret campaign Berman had engaged in between March and August 2020 to

undermine the SEC's notices and investigation, A51-53; and Berman's

disguised efforts to organize the DECN shareholder letter in June 2020 that falsely accused the SEC of unethical conduct.  A53-55.

Five months later, the grand jury returned a superseding indictment alleging four counts against Berman.  A60-84.  In addition to the securities fraud (count one) and false statements (count four) counts, the superseding indictment charged Berman with one count of wire fraud (count two), in violation of 18 U.S.C. 1343; and one count of obstructing a proceeding before the SEC (count three), in violation of 18 U.S.C. 1505.  *Id.*

### D.     Berman pleads guilty and is sentenced

In December 2023, on the eve of trial, Berman pleaded guilty, without a plea agreement, to counts one, two, and three of the superseding indictment. A228.[1]   Berman admitted that he "was personally involved in issuing [DECN's] press releases" in which he willfully and intentionally made materially misleading statements with the intent to defraud "about the progress and status of DECN's development of its COVID-19 blood test." SA353; A432.  He also acknowledged that he "engaged" in obstructive conduct "to influence the SEC to end its investigation into DECN and [him]self." A432.

---

[1] The district court dismissed count four upon the government's motion.  A425.

Berman and the government had been unable to conclude a plea agreement because they disagreed as to the application of the Sentencing Guidelines—specifically, the amount of loss involved in Berman's fraud. *See* U.S.S.G. § 2B1.1; A232. In its Presentence Investigation Report (PSR), the Probation Office determined that Berman's fraud had resulted in a loss of at least $27.8 million. A433. To reach that amount, the PSR followed the method described by the commentary to Section 2B1.1, which recommends determining loss in securities-fraud cases by calculating the difference between the stock's average price during the defendant's fraud and its average price in the period after the fraud has been disclosed to the market, and then multiplying that price difference by the number of outstanding shares. Because that calculus resulted in a figure greater than $25 million but less than $65 million, the PSR increased Berman's offense level by 22 levels under Section 2B1.1(b)(1)(L). *Id.*

The PSR also applied a four-level enhancement because Berman's offense "resulted in substantial financial hardship to five or more victims." A433 (citing U.S.S.G. § 2B1.1(b)(2)(B)). Considering those offense-level increase (and others not relevant here), combined with Berman's criminal

history, the PSR concluded that Berman had an advisory Guidelines range of 168 to 210 months' imprisonment.  A442.

The government agreed with the PSR's loss calculation, but Berman did not, contending instead that his fraud had caused a loss of zero.  SA16-17; A272.  At Berman's request, the district court held an evidentiary hearing during which experts for both sides testified as to the amount of loss involved in Berman's fraud.  The government's expert explained that he had followed the loss-calculation method recommended by Section 2B1.1's commentary and had reached the same result as the PSR.  A285-326.  Berman's expert testified that he had also applied that same formula but had concluded that Berman caused zero loss.  A326-393.  The experts' different loss calculations were primarily based on their disagreement as to when Berman's fraud had been "disclosed to the market."  The government's expert, in line with the PSR, understood Berman's fraud to have been disclosed to the market on December 18, 2020, the day Berman's indictment had been unsealed to the public. Berman's expert, by contrast, opined that Berman's fraud had been disclosed to the market on one of three earlier dates, either: (a) April 23, 2020, when the SEC issued its notice temporarily suspending trading in DECN's stock; (b) May 20, 2020, when the SEC's Division of Enforcement submitted its

declaration in support of the suspension; or (c) July 20, 2020, when www.OTCMarkets.com included a "caveat emptor" signal next to DECN's stock listing, alerting visitors that "[t]here may be reason for investors to exercise additional caution" before purchasing DECN stock.  SA267-273.[2] Consequently, because DECN's stock price in the period following all three of those days was higher than its average price during Berman's fraud, using any of the days as the fraud disclosure date resulted in a loss of zero.

At Berman's sentencing hearing, the district court sided with the Probation Office and the government and "f[ou]nd that the loss amount was approximately $28 million."  A509.  In particular, the court determined, Berman's fraud "became known to the public" on December 18, 2020, rather than on the earlier dates that Berman's expert had suggested.  A510.  The court explained that the SEC's notices in April and May 2020 "did not fully

---

[2] The OTCMarkets website states that it may assign the "[c]aveat [e]mptor" symbol to a stock for several reasons, including when "[a] regulatory authority or an exchange has halted or suspended trading for public interest concerns." A276-277.  Berman did not present any evidence for why DECN's stock had received the symbol, and his expert explained that the signal may have been present before July 20, 2020, but that he had selected that date for disclosure simply because it was "the oldest evidence [he] could find" of the symbol appearing on the OTCMarkets website based on his review of the free internet archive, the "Wayback Machine."  A345.

disclose the fraudulent statements to the public" because their allegations were "not as comprehensive as the later filed indictment," and had been "undercut" by "Berman's own conduct." A510-511. More specifically, the court noted how "a core component" of Berman's fraudulent scheme involved "persuad[ing] prospective investors" to "ignore the SEC, doubt its credibility[,] and keep investing in DECN," meaning that "investors [who] continued to buy" DECN stock "after the SEC suspended trading" did so "large[ly]" because Berman had "sow[n] distrust in the SEC's decision and attempt[ed] to persuade investors to keep buying" DECN stock. A511-512. Thus, the court stated, even if an SEC notice could "largely expose and ameliorate the fraud" "in [a] normal case," it did not do so here. A511. Further, the district court found the government's expert to have been "more credible" than Berman's expert, including because the defense expert's "explanation" for loss amount "at times simply boiled down to" the proposition that "'[i]nvestors and speculators are irrational.'" A509, A513 (quoting A355). The district court also discussed the uncontroverted history of DECN's stock price and noted that it had followed a rough "bell curve," where the stock traded at approximately two cents per share before the fraud period, rose considerably during the fraud period, and then returned to a price of roughly

two cents per share in December 2020, once the fraud had been disclosed to the market. A514, A324-325. As the court said, the government's theory was more credible because it "ma[de] sense" of and "explain[ed] that objective evidence," while Berman's theory "fail[ed] to explain" it. A514. And in a similar vein, the court noted that Berman's position on loss defied "common sense" by suggesting that a massive fraud had "cause[d] no harm to [its] victims." A516.

The district court also rejected Berman's argument that "the loss amount" of $28 million was "faulty because the Government [did] not point to any specific investor who relied on [Berman's] false statement[s]." A515. That "argument," the court said, ran "headlong into long-settled law on causation," which establishes that "circumstantial evidence," like the "tight temporal proximity" between Berman's statements and the investors' purchase of DECN stock, is "often" used to determine "loss amount in this exact context." A515-516.

In addition to increasing Berman's offense level by 22 levels based on the amount of loss involved in his offense, *see* U.S.S.G. § 2B1.1(b)(1)(L), the district court also adopted the four-level enhancement under U.S.S.G.

15

§ 2B1.1(b)(2)(B) based on its finding that Berman's fraud had resulted in substantial financial hardship to five or more victims.  A517-518.

Finally, after hearing argument from both parties as to their recommended sentences, the court announced that it was sentencing Berman to 84 months' imprisonment on counts one and two, and 60 months' imprisonment on count three, all to run concurrently.  A567.  The court explained that, although it viewed the PSR's recommended Guidelines range of 160 to 210 months' imprisonment as "proper[]," it decided to "vary[] down" from that range because of "several significant mitigating factors," including Berman's "age and … serious health conditions."  A565-566.  The court made clear, however, that—in light of the many unusual and serious aggravating factors involved in Berman's offenses—it "would still issue the same sentence even if [it was] wrong about the [G]uideline[s] range" generally (and the "loss calculation" specifically) because "no other sentence would be sufficient but not greater than necessary to achieve the purposes of sentencing."  A566.

## SUMMARY OF ARGUMENT

1.    In estimating loss at sentencing, the district court adhered to the Sentencing Commission's recommended approach; held a comprehensive evidentiary hearing at which the parties adduced competing expert testimony;

and reasonably credited the government's expert over the defendant's. There was no clear error in that approach or in the $27.8 million figure it produced.

Berman fails to contend with the substantial record evidence supporting the district court's bottom-line determination and instead cherry-picks two remarks in service of an unfounded claim of legal error. In context, however, the district court's statements reflect its appropriate application of the Sentencing Guidelines to the circumstances of this case. Because the court correctly identified the period during which Berman fraudulently inflated his company's stock and accurately pinpointed the date on which that fraud was disclosed to the public, no reason exists to vacate the resulting sentence.

2. The government provided the district court with more than sufficient evidence to support its loss calculation, including expert testimony, victim impact statements, and uncontroverted empirical data, all of which showed that Berman's fraud caused the loss. Again, Berman largely ignores the record evidence and invokes instead a purported requirement that the government prove that each and every DECN investor specifically relied on Berman's false statements. The single out-of-circuit case on which Berman relies for that requirement concerned a different theory of loss and is thus inapposite; indeed, on remand of that case, the government elicited expert

17

testimony and other evidence similar to that adduced here, and the court of appeals accordingly affirmed the reimposed sentence.  The same result is appropriate here.

3.     Finally, Berman repackages his procedural-error arguments into a claim of substantive unreasonableness, contending that his 84-month sentence was unreasonable because it exceeds what he understands to be the "correct" Guidelines range.  Because Berman's claims of Guidelines error lack merit and he presents no additional substantive objection, his claim fails.  In any event, even if Berman had prevailed in his sentencing objections, the district court made clear that it would still have imposed the same sentence—which would have been reasonable given the gravity of his conduct and the harm he occasioned.

## ARGUMENT

### I.     The District Court Correctly Estimated the Amount of Loss

Berman contends (Br. 26-40) that the district court erred in finding a loss amount of approximately $28 million.  According to Berman, that error resulted from the district court's incorrect subsidiary finding that Berman's fraud had been disclosed to the market on December 18, 2020.  Because that

disclosure-date finding was well-supported by the record, there was no clear error in the district court's loss determination.

## A.     Standard of Review

"The district court's loss calculation is a factual finding that [this Court] review[s] for clear error." *United States v. Leonzo*, 50 F.3d 1086, 1088 (D.C. Cir. 1995).  The clear-error standard is "deferential," meaning this Court will not "overturn a finding simply because [it is] convinced that [it] would have decided the case differently." *Glossip v. Gross*, 576 U.S. 863, 881 (2015) (internal quotation marks omitted).  The district court's loss findings "must govern" as long as they are "plausible," "even if another [finding] is equally or more [plausible]." *Cooper v. Harris*, 581 U.S. 285, 293 (2017); *see also United States v. Hallford*, 756 F. App'x 1, 5 (D.C. Cir. 2018) (per curiam) (unpublished) (district court's "factual findings are presumed correct, particularly when based on oral testimony").  Because "[t]he sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence," his "loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1 cmt. n.3(B); *see also United States v. Edwards*, 496 F.3d 677, 683-684 (D.C. Cir. 2007).

"[W]here a defendant fails to raise a claim at his sentencing hearing," his contention on appeal is reviewed for plain error. *United States v. Hunter*, 809 F.3d 677, 681 (D.C. Cir. 2016). To establish plain error, a defendant must show "(1) an error; (2) that is plain; and (3) affects substantial rights." *United States v. Stevens*, 105 F.4th 473, 479-480 (D.C. Cir. 2024). "If he makes this showing," this Court "may grant relief if the error 'had a serious effect on the fairness, integrity or public reputation of judicial proceedings." *Id.* at 480 (quoting *Greer v. United States*, 593 U.S. 503, 508 (2021)).

## B.    Relevant Authority

"Under the Sentencing Guidelines, punishment for certain economic crimes depends in part on the value of the accompanying loss." *United States v. Bolla*, 346 F.3d 1148, 1150 (D.C. Cir. 2003). For instance, for basic economic offenses like fraud, Section 2B1.1 of the Guidelines calculates a defendant's "offense level" based on "the amount of loss for which [he] is responsible." *United States v. McCants*, 554 F.3d 155, 158 (D.C. Cir. 2009). The offense level augmentations under Section 2B1.1(b)(1) range from "no increase" for offenses involving loss of $6,500 or less, to 30 levels for offenses involving more than $550 million in loss. U.S.S.G. § 2B1.1(b). When a defendant's offense

involves loss between $25 million and $65 million, his offense level is increased by 22 levels.  U.S.S.G. § 2B1.1(b)(L).

Where a defendant fraudulently inflates the value of a publicly traded security, the sentencing court may "us[e] any method that is appropriate and practicable under the circumstances" to calculate the amount of loss involved in the offense.  U.S.S.G. § 2B1.1 cmt. n.3(E)(ix).  The Guidelines describe one such approach, often referred to as the modified rescissory method, which instructs sentencing courts to calculate loss in two steps:

> (I)    [C]alculat[e] the difference between the average price of the security … during the period that the fraud occurred and the average price of the security … during the 90-day period after the fraud was disclosed to the market; and [then]

> (II)   [M]ultiply[] that difference in average price by the number of shares outstanding.

*See* U.S.S.G. § 2B1.1 cmt. n.3(E)(ix).  The modified rescissory method ensures that the calculated loss is "attributable to the change in value of the security," and it encourages courts to consider "the extent to which" the calculated loss amount "includes significant changes in value not resulting from the offense" but rather from "changes caused by external market forces."  *Id.*

In securities-fraud cases, as in all cases involving basic economic offenses, loss determinations "need only" be "reasonable estimate[s]"; the

21

amount of loss "need not be determined with precision." *United States v. Bras*, 483 F.3d 103, 112 (D.C. Cir. 2007) (internal quotation marks omitted).

### C. The District Court Did Not Err in Determining That Berman's Fraud Had Been Disclosed by the Indictment

In applying the modified rescissory method to calculate the loss involved in Berman's offense, the district court found Berman's fraud to have been disclosed to the market on December 18, 2020, the date his indictment was unsealed. The district court based that determination on the Probation Office's PSR findings and the government's loss-related evidence, including in particular the testimony of Professor Joshua Mitts, an expert in financial economics, who had analyzed the facts of this case. In reaching its conclusion, the district court also explained why it had rejected Berman's theory of loss, including his specific contention that the fraud had been disclosed to the market not in December 2020, but months earlier in either April, May, or July 2020.

#### 1. The court appropriately adjudicated the battle of the experts at sentencing.

The record reveals that the district court carefully considered the positions of both parties before determining that Berman's fraud had been disclosed to the market in December 2020. In addition to accepting briefing

22

and voluminous evidence, *see* Br. 18 (emphasizing that "the parties submitted more than 350 pages of briefing and evidence" on "the issue"), the court held a comprehensive evidentiary hearing at which experts for both parties testified extensively and counsel for both sides presented argument. *See supra* pp. 12-13; *see Bras*, 483 F.3d at 112 (finding no error in court's loss estimate in part because it came after lengthy evidentiary hearing). After taking the issue under advisement for about a month, the court offered a thorough rationale for its decision, providing at least five detailed reasons for why it viewed the day of the indictment's unsealing as best reflecting when Berman's fraud had been disclosed to the market.

*First*, the court found that "December 18, 2020, was the date on which the full scope of [Berman's] misconduct became known to the public and it was the first date on which the falsity of his statements was finally revealed." A510. That determination was indisputably accurate. Indeed, Berman himself concedes (Br. 16 n.6) that "[t]he indictment … reveal[ed] … new information" to the public, but he undersells the import of that disclosure.

For example, before the indictment was unsealed, the public did not know (and could not have known) that Berman had sent private e-mails in March 2020 "discuss[ing] his plan to use the COVID-19 crisis as an

opportunity to increase DECN's value and address DECN's financial issues," and had even referred to the plan of detecting "coronavirus through impedance" as "the story that [would] allow [him] to raise millions." *See* A42-43. Moreover, the public was not previously aware that Berman had made false and misleading statements "touting the progress of DECN's emergency use application to the FDA." A48. The indictment chronicled those misrepresentations in detail, using over a dozen substantive paragraphs to explain Berman's true, unproductive interactions with the FDA and the simultaneous public statements he made suggesting that DECN was close to obtaining emergency use authorization. *See, e.g.*, A50 (recounting Berman's statements that DECN was "about a week" away from completing the "testing required to receive the [emergency use authorization]" when he knew that not to be the case).

Most saliently to the district court's analysis, the indictment alerted the public for the first time to the "extraordinary" efforts that Berman had undertaken to "conceal[] [his] scheme from regulators, law enforcement, and the investing public." A44, A511. Those concealment efforts, which ran through at least August 2020, constituted an integral component of Berman's fraud, allowing him to "maintain the" fraudulently inflated "share price of

24

DECN," A44, by "induc[ing] investors to ignore the [SEC's] notice[s] and keep buying" DECN stock.   A511.   The indictment described these efforts in exacting detail, explaining how, among other things, Berman used an alias to post over 1,000 comments on investor message boards between March and August 2020 that both praised DECN's business operations and refuted allegations of false statements.   A52.   The indictment also recounted how, in June 2020, Berman had secretly directed and drafted purportedly independent shareholder letters that attempted to terminate the SEC's investigation of him and his company.   A44-45.   In sum, none of this information regarding a key portion of Berman's fraud was known to the public until Berman's indictment was unsealed on December 18, 2020. Accordingly, the district court acted more than reasonably in treating December 18, 2020, as the date on which Berman's fraud was "disclosed to the market."   U.S.S.G. § 2B1.1 cmt. n.3(E)(ix)(I).

*Second*, beyond articulating why December 18 was the right date, the district court explained why each of Berman's proposed dates was the wrong one.   The court first noted that Berman's fraud had not been disclosed by the SEC's notices in April and May 2020 because the allegations in those notices were "not … comprehensive."   A510.   Even "[m]ore importantly," the court

found that, even if similar notices "might" adequately disclose fraud "in the normal case," they had not done so here because Berman "went to extraordinary lengths" to "undermine the efficacy of the … notices" by, among other things, "persuad[ing] prospective investors to ignore the SEC, doubt its credibility and keep investing in DECN."  A511 (citing indictment); *see supra* p. 14.  "Sow[ing] distrust in" the SEC's notices and investigation was not an afterthought for Berman; it a formed "a core component of [his] criminal scheme," allowing him to "successfully induce[] investors to ignore the [SEC's] notice[s] and keep buying" DECN stock at an inflated price well into the summer and fall of 2020.  A511-512.  Thus, as a purely factual matter, the SEC notices from April and May 2020 could not have disclosed Berman's fraud to the market when "a core component" of that fraud—Berman's "extraordinary" efforts to discredit the notices—did not begin (indeed, could not have begun) until *after* those notices had been issued.  And the same is true for the date in July 2020 on which Berman's expert claimed to have found a caveat emptor symbol on OTCmarkets.com; that symbol did not (and again, could not) have alerted potential investors to the essential portion of Berman's fraud that had not yet occurred.

*Third*, the district court also rejected Berman's proposed disclosure dates, which had been identified by his expert James Reilly, because it "found" Reilly to have offered noncredible analysis, including because he had been "repeatedly … confused" at the evidentiary hearing at which he testified, and "self-contradictory on" the all-important issue of when Berman's fraud had been disclosed to the market. A513. Moreover, the court discounted Reilly's views because his response to contrary evidence "at times simply boiled down to" a belief that "'[i]nvestors and speculators are irrational,'" which the district court "f[ound]" not "to be a credible answer." A513 (quoting A355). This testimony stood in stark contrast to the government's expert, whom the court found to have offered "clear[] expl[anations]" and evinced an "openness about the potential limitations of his methodology." A512. "[I]t is well-settled" that these sorts of "'credibility determinations are entitled to the greatest deference from this [C]ourt on appeal,'" and Berman provides no reason to depart from the normal course here. *United States v. Hart*, 324 F.3d 740, 747 (D.C. Cir. 2003); *see also United States v. 269 Acres, More or Less, Located in Beaufort Cnty., S.C.*, 995 F.3d 152, 164 (4th Cir. 2021) (in "battle of experts" scenarios, courts of appeals "defer to the district court in weighing the varying

27

opinions [the] experts offer, reversing only when the district court has made a clear error").

*Fourth*, along similar lines, the district court found "not credible" the testimony of Berman's expert that Berman's "fraud resulted in a gain as opposed to a loss" for DECN's investors.  A513.  Although that result was "theoretically possible," the court found it to be "highly unlikely in this specific case" "where [the] defendant [had] commit[ted] fraud on this scale." A513-516.

*Fifth*, the district court "put weight" on the extent to which the parties' theories of disclosure dates aligned with "the objective evidence."  A514.  Relying on a chart introduced by the government without objection,[3] the district court observed that DECN's stock price had followed a rough "bell curve," "hover[ing] around two cents per share" in the pre-fraud period of January 2019 to March 2020; rising "considerably"—to over 40 cents per share—during the "fraud period" of March 2020 to December 2020; and then dropping and "return[ing] to" its original value of roughly two cents per share

---

[3] The chart, which the government introduced as Exhibit 6A-2 during the evidentiary hearing, *see* A303-304 (admitting Exhibit 6A-2), was prepared by the Financial Industry Regulatory Authority (FINRA) and "using data from Bloomberg." *Id.* Without objection, the government's expert "adopt[ed] [the] chart as [his] own" for purposes of his testimony.  A304.

once "the fraud was finally disclosed" in December 2020.  A514 (citing A324); *see also* SA362.    As the district court concluded, the government's loss "theory" "explain[ed] the observational data" perfectly, while "the defense theory fail[ed] to" do so at all.  A514.

For all these reasons, the district court's determination that Berman's fraud was disclosed to the market on December 18, 2020, was well-supported by the record.  It thus did not constitute error, let alone clear error, especially in light of the court's "need" to provide "only" a "reasonable estimate" of the loss involved in Berman's fraud.  *Bras*, 483 F.3d at 112 (internal quotation marks omitted).

### 2. Berman fails to meaningfully contest the district court's factual determinations.

Berman does not provide much, if anything, to dispute such a conclusion. Although his brief renews his contention that the SEC notices in April and May 2020 "disclosed [his] fraud to the market" and thus that "the district court erred" by finding a fraud-disclosure date of December 18, Br. 36 (capitalization altered), he offers little explanation for why this is so, largely repeating his arguments from the district court that the fraudulent statements "that the SEC identified" in its notices went on to "form[] the basis for the government's indictment" and "mirror[ed] [the] allegations that would later appear in the

29

indictment." Br. 37-38. But while that may be true to an extent—the SEC notices undoubtedly mirrored *some* of the allegations later put forward by the indictment—it ignores the district court's numerous persuasive reasons for discounting the ability of the SEC notices to have disclosed Berman's fraud, including that they (i) were silent as to a key component of Berman's fraud, *i.e.*, his months-long, "extensive" effort between March and August 2020 to torpedo the SEC's investigation; (ii) had their expected "efficacy" or impact "undermined" by Berman's successful efforts to discredit them; (iii) had been initially suggested as disclosure dates through analysis performed by an expert the district court found to lack credibility; and (iv) did not align with the undisputed objective data, which showed DECN's stock price nosedive from its inflated price to its pre-fraud price no earlier than December 2020. *See supra* pp. 23-29. By leaving those reasons unaddressed, Berman falls far short of establishing that the district court's finding was clearly erroneous. *See City of Waukesha v. E.P.A.*, 320 F.3d 228, 250 n.22 (D.C. Cir. 2003) (per curiam) ("argument … raised in the opening brief only summarily … is waived").

### 3. Berman has identified no legal error in the district court's application of the Sentencing Guidelines

Instead of demonstrating clear error in the sentencing court's findings, Berman contends (Br. 25-26) that the court "misinterpreted" the Sentencing Guidelines in two respects that this Court should review *de novo*. But the district court's determinations were merely applications of uncontroversial sentencing principles to the facts of Berman's case, not legal "interpretations" of the Guidelines. In any event, Berman cannot show that the court's determinations were erroneous under any standard of review.

a.    Berman claims first that the district court misread and misinterpreted the modified rescissory method set for in the commentary to Section 2B1.1. As noted above, that commentary, in relevant part, instructs courts to calculate "the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market." U.S.S.G. § 2B1.1 cmt. n.3(E)(ix). According to Berman, the district court "read 'disclosed to the market' to really mean 'fully disclosed to the market,'" and thus "grafted the word 'fully' onto [the] text" of the Guideline's commentary. Br. 26.

A complete and contextualized review of the record reveals that the district court did no such thing. Berman cites to a single page of the sentencing-hearing transcript, in which the district court stated its finding

that Berman's fraud had been disclosed to the market on December 18. A510. In reaching that conclusion, the district court laid out the parties' competing proposals for the disclosure date and then stated that it "agree[d] with the Government. December 18, 2020, was the date on which the full scope of [Berman's] misconduct became known to the public and it was the first date on which the falsity of his statements was finally revealed." A509-510.

Berman apparently understands the court's fleeting "full scope" descriptor to impose a blanket rule that partial disclosures can never qualify as the dates on which a defendant's fraud has been "disclosed to the market" under the modified rescissory method. But that reading is inconsistent with the remainder of the court's reasoning. Mere lines after referring to the "full scope" of Berman's fraud, the court explained that the SEC notices from April and May 2020 (which all agree revealed only part of the fraud) "would" constitute suitable disclosure dates "in the normal case" because they often "largely expose and ameliorate the fraud." A511. That was just not so here, the court explained, because "Berman's own conduct"—*i.e.*, his "extraordinary" efforts to "undermine the efficacy of the SEC notices" and his "success[]" in "induc[ing] investors to ignore [them]"—made this "the unusual

32

case" where the SEC's announcements were not enough to disclose the true depths of Berman's fraud.  A510-511.

Nowhere did the court suggest that the modified rescissory method requires that every aspect of a defendant's fraud be "fully" revealed before it can be deemed "disclosed to the market" under Section 2B1.1.  Instead, the court explained why—in *this* case, under *these* facts—the SEC notices did not suffice.  Indeed, as the district court also announced contemporaneously, Berman's efforts to "persuade prospective investors to ignore the SEC" constituted "a core component of" his fraud.  A511.  The court thus determined that the SEC notices failed to disclose Berman's fraud to the market not only because they failed to contemplate the "full" fraud, but—more importantly— because Berman's remaining deceptive conduct was oriented toward (and, apparently, effective at) undermining the revelatory value of these notices.

Because the district court made no categorial pronouncement as to the legal effect of SEC orders under the Sentencing Guidelines, Berman's cited authorities—in which a handful of out-of-circuit district courts found SEC orders to adequately disclose frauds (or aspects thereof) in circumstances different from those here—are inapposite.  In *United States v. Peppel*, No. 06-cr-196, 2011 WL 3608139, at *9 (S.D. Ohio Aug. 16, 2011), for instance, the

court determined that "[t]he announcement of [an] SEC investigation is an efficient and highly relevant proxy by which to measure the price effects of the fraudulent conduct" because "[t]here was never another 'event' that" disclosed the fraud. In *United States v. Ferguson*, 584 F. Supp. 2d 447, 450, 453 (D. Conn. 2008), the district court looked to three days on which the defendants' banks had issued various announcements—including of an investigation being conducted by the New York Attorney General and the SEC and of changes to the bank's executive leadership—that "disclosed" "new and significant information related to the [underlying] fraud," and it found that those days included not just the relevant disclosures but also "statistically significant price reaction in [the bank's] stock price"; here, as noted above, DECN's stock price did *not* react to the SEC notices in April and May 2020—an absence that the district court found relevant to its analysis. And Berman's remaining district court-decisions likewise stand at most for the proposition that SEC notices *can* qualify as disclosure events when the particular circumstances support such a finding—not that they always and everywhere will.

b.     For the first time on appeal, Berman also asserts (Br. 34) that the district court misinterpreted the Guidelines by "import[ing] into the commentary text" of Section 2B1.1 "a requirement that the fraud disclosure

34

period begin right after the fraud period ends." As support for that contention, Berman cites the district court's statement, made during the sentencing hearing, that "the question is solely … when the fraud period ended." A509. Apparently based on that statement, Berman argues that the district court ruled, as a matter of law, that the fraud's disclosure date must always immediately follow the conclusion of the fraud. *See* Br. 34.

Because Berman did not object before the district court to what he now claims (Br. 23) was a "legal error[]," his argument on appeal is reviewed only for plain error. *Holguin-Hernandez v. United States*, 589 U.S. 169, 170-171 (2020) ("A criminal defendant who wishes a court of appeals to consider a claim that a ruling of a trial court was in error must first make his objection known to the trial-court judge. … Errors not brought to the court's attention … are subject to review only insofar as they are plain." (internal quotation marks omitted)). Berman does not even attempt to meet the rigorous requirements of plain-error review. *Cf. United States v. Roach*, 896 F.3d 1185, 1192 (10th Cir. 2018) ("[F]ailure to argue plain error on appeal waives the argument."). Nor could he do so if he tried.

To begin, the district court did not err. Contrary to what Berman suggests, the district court did not hold that a defendant's fraud must always

35

have terminated before it can be disclosed to the market.  Berman appears to take the district court's statement that "the question is solely … when the fraud period ended," as indicating that the court understood the modified rescissory method as always treating the fraud as disclosed only after it has finished.  But, as with his "full scope" argument above, Berman makes far too much out of an isolated statement.  The district court made this statement while adopting the loss analysis put forward by the government and its expert.  *See* A509 ("I found [the government's expert's] testimony more credible than [Berman's expert's]"; "I agree with the Government.").  And as explained above, a central component of that analysis was the conclusion that Berman's fraud continued through December, when it was disclosed to the public through the unsealing of his indictment.  *See* SA16-17 (government's proposed fraudulent period ran from March 3, 2020, to December 17, 2020).  Accordingly, in stating that the "sole[]" "question" was "when the fraud period ended," the district court merely recognized a fact about the analysis it had adopted: that the dates of the fraud's conclusion and its disclosure to the market were here one and the same.  In no way does that statement assume that a fraud's disclosure must *always* immediately follow its conclusion; it merely acknowledges that as much was true for this specific case.

36

In any event, even if the court's statement constituted a legal error in the manner Berman suggests, Berman fails to show that the error affected his substantial rights. "A sentencing error affects substantial rights when there is a reasonable likelihood it impacted the sentence," *United States v. Mack*, 841 F.3d 514, 526 (D.C. Cir. 2016), and the record here is clear that no such likelihood exists. As discussed *infra* pp. 51-53, Berman cannot show a reasonable likelihood that the district court's selection of a fraud-disclosure date preceding the fraud's conclusion made any difference to his sentence.

## II. The District Court's Loss Determination Was Supported By Sufficient Evidence

Berman also contends that insufficient evidence established "that all [DECN] investors relied on [Berman's] fraudulent statements." Br. 43. That contention is wrong twice over: the government was not required to introduce evidence showing that all DECN investors specifically relied on Berman's false statements, and the voluminous evidence the government put forward satisfied the appropriate evidentiary burden under Section 2B1.1.

### A. Standard of Review

"The burden is on the government to prove facts in support of a sentence enhancement by a preponderance of the evidence," *United States v. Washington*, 115 F.3d 1008, 1010 (D.C. Cir. 1997), and the amount of loss

involved in an offense qualifies as a sentencing enhancement, *see United States v. Salmon*, 948 F.2d 776, 778-779 (D.C. Cir. 1991).

When a defendant argues that a "preponderance of the evidence did not support the district court's enhancement of his offense level," this Court applies clear error review. *United States v. Shah*, 453 F.3d 520, 523-524 (D.C. Cir. 2006). That standard is "deferential" to the district court's underlying findings. *United States v. Thomas*, 114 F.3d 228, 261-262 (D.C. Cir. 1997).

## B. Relevant Authority

Under Section 2B1.1, "'[a]ctual loss,'" which the district court assessed at roughly $28 million, "means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1(b)(1) n.(C)(i). The Sentencing Commission has stated that this definition "incorporates [a] causation standard that, at a minimum, requires factual causation (often called 'but for' causation) and provides a rule for legal causation (*i.e.*, guidance to courts regarding how to draw the line as to what losses should be included and excluded from the loss determination)." U.S.S.G. App. C, Volume 2, Amendment 617 (Nov. 1, 2001). Courts have therefore held that "the Sentencing Guidelines import the legal concept of a causal relationship

between the defendant's conduct and the determined loss." *United States v. Peppel*, 707 F.3d 627, 644 (6th Cir. 2013) (internal quotation marks omitted).

In the context of criminal sentencing, "[d]istrict courts must take a realistic, economic approach to determine what losses the defendant truly caused." *United States v. Bazemore*, 839 F.3d 379, 390-391 (5th Cir. 2016) (per curiam) (internal quotation marks omitted). To do so, courts "gauge[] the amount of loss caused" by determining the "harm that society as a whole suffered from the defendant's fraud." *United States v. Berger*, 587 F.3d 1038, 1044 (9th Cir. 2009) (emphasis omitted). Accordingly, in securities-fraud cases specifically, "where the value of [a] securit[y] ha[s] been inflated by a defendant's fraud, the defendant may have caused aggregate loss to society … even if various individual victims' respective losses cannot be … linked to the fraud." *Id.*

Further, as noted above, Section 2B1.1 recommends applying the modified rescissory method in securities-fraud cases to "determin[e] the amount of shareholder loss" caused by the defendant's offense. *United States v. Brown*, 595 F.3d 498, 524 (3d Cir. 2010); *see* A299, A306-307 (government's expert testifying that modified rescissory method was appropriate way of determining investor loss caused by Berman's fraud). Section 2B1.1 also

39

instructs courts to "consider … the extent to which the amount … determined" by the modified rescissory method "includes significant changes in value [of the stock] not resulting from the offense."  U.S.S.G. § 2B1.1 cmt. n.3(E)(ix). That consideration ensures that applying the modified rescissory method will reveal solely the loss caused by the defendant's offense, and not loss caused by "external market forces."  *Id.*

## C.   The Government Introduced Sufficient Evidence to Support the District Court's Loss Calculation

The government presented, and the district court relied upon, more than enough evidence to support the determination that Berman "caused his investors" approximately $28 million in loss. A516.

### 1.   Abundant direct and circumstantial evidence established causation.

The court heard extensive testimony from the government's expert regarding his application of the modified rescissory method to "obtain a measure of the total decline in [DECN stock's] market value … caused by [Berman's] fraud."  A291.  That analysis, which the district court ultimately found credible and adopted, A509-510, A512, considered undisputed data regarding DECN's stock price and financials.  *See, e.g.*, A304 (government expert explaining Exhibit 6A-2, which tracked DECN's stock price over time);

40

*see supra* pp. 12, 28.  Moreover, in just the manner suggested by Section 2B1.1, the government's expert conducted and explained to the court his sophisticated regression analyses that allowed him to conclude that DECN's stock price had "no statistically significant relationship" to external "market factors," such that the fluctuations in DECN's stock price were "not caused by the market," but rather by Berman's fraud.  A297-298.

In addition to this credible expert testimony, the court was also presented with evidence, through the PSR, of investors who suffered extensive harm from Berman's misconduct.  For example, the PSR recounted one LLC, which owned millions of shares of DECN stock, that had all of its stock "render[ed]" "worthless" when "the criminal acts committed by" Berman "'destroyed' DECN's business."  A431.  Other victims, who jointly invested in DECN because they "believ[ed] [Berman's] claims that his COVID test strip had the fastest turnaround time and would be FDA approved," suffered $139,000 in losses; another was "conned out of over $40,000"; another lost $3,000 after "pour[ing] money into DECN under false pretenses"; and yet another felt personally "betrayed" by Berman and "lost $7,400 to [his] criminal conduct."  A430-431 (punctuation omitted).  The victims identified by the PSR

41

specifically detailed losses exceeding $3.18 million. A430-431 (sum of loss figures of specified victims).

Moreover, the district court found particularly relevant the "[g]overnment's evidence of" the "tight" "temporal proximity" between when Berman made his false statements and when DECN's "stock price[]" experienced "significant spikes." A515-516 ("significant spikes in [DECN's] stock price[]" "shortly following Mr. Berman's false statements" "reflect heightened demand for stock by purchasers"). In the court's own words, "[t]his tight temporal proximity is further circumstantial evidence that Mr. Berman's statements caused investors to buy DECN stocks." A516. In fact, the court's causation findings were even more specific, noting that, "after the SEC suspended trading" in DECN stock, investors' decision to continue purchasing the stock was "driven in large part by Mr. Berman's own conduct" of "sowing distrust in the SEC's decision and attempting to persuade investors to keep buying." A511-512. "That," the court emphasized, "is a sufficient causal connection to find [that] the investors' post-suspension losses remained attributable to Mr. Berman's conduct." A512.

Finally, Berman himself, in pleading guilty, recognized various facts that help establish that he caused the loss in question. Berman acknowledged

42

that he alone was "responsible for issuing" DECN's false press releases, and he admitted that he "issued" those press releases "to generate favorable publicity" for DECN and "to defraud" DECN investors. A229-232, A266. While entering his guilty plea, Berman even acknowledged that he "expect[ed] his Sentencing Guidelines calculation" would include a two-level enhancement to his offense level based on his conduct affecting "10 or more victims." A232.

In sum, that evidence—which included sophisticated and credible expert analysis; extensive victim impact statements tracking millions of dollars in losses; objective financial data revealing a tight connection between Berman's misconduct and investors' behavior; and Berman's own admissions—more than sufficed to establish by a preponderance that Berman's misconduct caused approximately $28 million in loss.

> ### 2. Berman's cited authority is inapposite and, to the extent relevant, does not help him.

Rather than countering this substantial evidence, Berman argues that, in addition to proving that his fraud caused $28 million in loss, the government was required to "demonstrate that *all losses in its loss calculation came from investors who relied on* [Berman's] fraudulent statements." Br. 41 (emphasis added). Berman derives (Br. 40, 42) this purported investor "reliance" requirement from a single Eleventh Circuit case, *United States v. Stein*, 846

F.3d 1135 (11th Cir. 2017). But the Eleventh Circuit's consideration of a different theory on different facts in *Stein* does not control this Court's disposition of Berman's case.

To be sure, *Stein* bears superficial similarities to this case: there, as here, a defendant artificially inflated the value of a medical-device company's stock by issuing false press releases. 846 F.3d at 1139. In that case, however, the sentencing court calculated the loss caused by the defendant's fraud not by applying the modified rescissory approach but instead by using a novel "'buyer's only' method," which "consider[s] only those customers who … purchased [the company's] shares during the fraudulent period." *Id.* at 1144 (internal quotation marks omitted). Using that approach (over the defendant's objection), the court "value[d] the amount of" shares that 2,415 unique investors had purchased during the fraud period, "subtract[ed] the value of those shares as of the end of the fraudulent period," and arrived at a loss of $13.19 million. *Id.* In reaching that conclusion, the district court relied on testimony from just two victims claiming to have relied on the defendant's press releases, as well as statements showing that victims "relied on press releases generally," although "not necessarily the specific press releases [the defendant had] disseminated." *Id.* Meanwhile, the court's analysis failed to

44

"take into account" "extrinsic market factors," a potentially serious mistake in light of the defendant's contention that "specific events unrelated to the fraud," "including the 2008 financial crisis and … rampant short selling of [the company's] stock," had caused the stock price to decline during the fraud period. *Id.* at 1145.

On that record, the Eleventh Circuit held that the district court lacked "an adequate factual basis" to support its determination "that each" of the 2,415 unique investors had "relied on [the] fraudulent information [the defendant] disseminated." 846 F.3d at 1151. That makes sense: when, at the government's urging, the court calculates loss using a method that looks exclusively to stock purchases made by specified investors, and the government, pursuant to that method, identifies a specific number of such investors, the evidence must "support the inference that *all* [the identified] investors relied on [the defendant's] fraudulent information when deciding to purchase [the company's] stock." *Id.* at 1154.

But the same is not true where, as here, the district court calculates loss using the modified rescissory method. Unlike the "buyer's only" method, the modified rescissory method considers the stock's price once the fraud has been "disclosed to the market," and thus does not require examination of particular

45

investors and their purchases in the way the "buyer's only" method does. *See* Appellant Br., *United States v. Stein*, 2015 WL 3442393, at \*50 (11th Cir. May 27, 2015) (defendant in *Stein* explaining that, in contrast to the modified rescissory method, the "buyer's only" method considers loss "during [a] period" where defendant's "[mis]conduct" has not yet been "disclosed to the market"); *cf. United States v. Herman*, No. 22-8057, 2023 WL 6861766, at \*10 (10th Cir. Oct. 18, 2023) (unpublished) (rejecting defendant's argument that *Stein* required the government to "show which investors relied on the [defendant's] fraudulent press releases" in case where district court applied modified rescissory method).  Because Berman urged the district court to apply the modified rescissory method here, he cannot now complain about its having done so faithfully.  Accordingly, the district court was free to proceed under the general rule that "gauges the amount of loss" caused by the defendant by looking to the "harm that society as a whole suffered from the defendant's fraud" without needing to "link[]" any "individual victims' respective losses" "to the fraud."  *Berger*, 587 F.3d at 1044; *see also* A515 (district court explaining that Berman's investor reliance argument "runs headlong into long-settled law on causation").  As explained above, *see supra*

pp. 28-29, the evidence presented here more than satisfied that standard, and Berman's argument thus fails.

Moreover, even if the *Stein* rule applied here, the evidence would still have been sufficient. In *Stein*, the Eleventh Circuit clarified that, when the government must prove investor reliance, it may do so through "circumstantial evidence from which the district court may reasonably conclude that all of the investors relied on the defendant's fraudulent information." 846 F.3d at 1153-1154. Accordingly, on remand, the government offered evidence much like the corpus of proof it adduced here: expert "testi[mony] that returns for [the] stock were 18% higher than would be expected (that is, an abnormal return) … when the company issued a fraudulent press release" and that "there w[ere] … abnormal negative return[s]" linked to disclosure events. *United States v. Stein*, 964 F.3d 1313, 1320 (11th Cir. 2020). Reviewing this evidence on Stein's second appeal, the Eleventh Circuit determined that, "as [it] instructed in the earlier opinion, the district court relied on 'specific circumstantial evidence' to reasonably conclude that the investors in fact relied on Stein's fraudulent information." *Id.* The court of appeals accordingly affirmed Stein's sentence. *Id.* at 1325. The same outcome should obtain here.

47

###### 3. Victims' statements demonstrated that Berman's fraud caused the substantial hardship.

Next, in a section of his brief spanning just over a page, Berman contends (Br. 47) that "[t]he same arguments regarding the government's failure to demonstrate reliance for loss amount apply with equal force to the substantial hardship enhancement." That argument fails for the reasons just explained.

The substantial hardship enhancement requires the government to show that five victims suffered substantial financial hardship, and as the district court concluded, the government presented impact statements from more than five victims revealing hardships that were undisputedly substantial. A517-518 (detailing six victims who suffered such severe losses from Berman's fraud that there could be "no room for serious argument that the standard is not met" and noting that "[t]he list" of similarly affected victims "goes on."). Like he did below, Berman faults (Br. 47) the government for "not hav[ing] a single investor testify about why he or she invested in DECN stock." But as the district court explained in rejecting that argument, Berman "cites no case law or regulation to support his claim" that "[t]he Government was … required to call [his] victims to the stand and have each one march through what he

considered before investing in DECN." A518. Because Berman has still not cited any such authority, his argument fares no better on appeal.

## III.   Berman's Sentence Was Substantively Reasonable

Last, Berman avers that his sentence of 84 months' imprisonment was substantively unreasonable because it far exceeded the "correct" Guidelines range of 6 to 12 months' imprisonment. Br. 48-49, Br. 21 & n.7. The Guidelines range Berman identifies, however, is not "correct," and his term of imprisonment was substantively reasonable under the appropriate Guidelines range that the Court applied. But even if Berman held an accurate view of the applicable Guidelines, the district court would have imposed the same sentence under that lower Guidelines range, and its sentence would have been substantively reasonable for the various reasons provided by the court.

### A.   Standard of Review

"In considering a defendant's challenge to the substantive reasonableness of a sentence, [this Court] ask[s] the following question:  '[i]n light of the facts and circumstances of the offense and offender, is the sentence so unreasonably high or unreasonably low as to constitute an abuse of discretion by the district court?" *United States v. Williamson*, 903 F.3d 124, 136 (D.C. Cir. 2018) (quoting *United States v. Gardellini*, 545 F.3d 1089, 1093

(D.C. Cir. 2008)).  Whether a sentence is "within, above, or below the applicable Guidelines range," "it will be an unusual case where [this Court] overturns a sentence as substantively unreasonable." *Gardellini*, 545 F.3d at 1096.  There is no "'presumption of unreasonableness' for outside-the-Guidelines sentences," nor do "outside the-Guidelines sentences require a showing of "extraordinary' circumstances' or trigger any kind of 'proportional' appellate review to the Guidelines." *Id.* at 1093 (quoting *Gall v. United States*, 552 U.S. 38, 47 (2007)).

## B.    The Sentence was Substantively Reasonable Under the Guidelines Range that the Court Calculated

Berman contends (Br. 49) that the district court applied an improper Guidelines range of 168 to 210 months and should have instead applied what he claims was the "correct" Guidelines range of 6 to 12 months.[4]  But Berman's assertion for why his proposed Guidelines range is "correct" merely incorporates the loss-related arguments he has already raised, all of which lack merit for the reasons explained above.

Berman does not dispute that his 84-month sentence was substantively reasonable under a Guidelines range of 168 to 210 months' imprisonment.

---

[4] Berman provides a cursory explanation for how he reached the "correct" Guidelines range in the Factual Background section his brief.  *See* Br. 21 n.7.

Nor could he. The court's sentence of 84 months constituted a significant downward departure from the applicable Guidelines range, and this Court has described it as "hard to imagine" that a defendant in these circumstances could make a meritorious substantive reasonableness argument. *United States v. Mejia*, 597 F.3d 1329, 1343 (D.C. Cir. 2010); *see also United States v. George*, 403 F.3d 470, 473 (7th Cir. 2005) ("It is hard to conceive of below-range sentences that would be unreasonably high."). And that is all the more so true here because, as the district court found, Berman engaged in serious misconduct that caused severe harm to many. *See infra* p. 52.

## C.     Even if Berman is Correct About the Applicable Guidelines Range, the Court Would Still Have Imposed the Same Substantively Reasonable Sentence

Berman also, however, fails to show that his sentence of 84 months' imprisonment was substantively unreasonable even if he is correct that his Guidelines range should have been 6 to 12 months' imprisonment.

### 1.     The district court made clear at sentencing that it would impose the same custodial term for Berman's conduct if it made an error in the loss calculation.

At sentencing, the district court made clear that it "believe[d]" it had "properly calculated" Berman's Guidelines range. A566. But the court also declared that "even if [it was] wrong about the [G]uideline[s] range" due to an

51

error in its "loss calculation," it "would still issue the same sentence" of 84 months' imprisonment. A566. That was so, the court explained, because the "unusual aggravating and mitigating factors" of this case, which it believed "the [G]uidelines" did not "fully capture," made it such "that no other sentence would be sufficient but not greater than necessary to achieve the purposes of sentencing," regardless of which Guidelines range applied. A566. Specifically, on the aggravating side of the scale, the court recounted that Berman had "caused" "very real financial, emotional and psychological harms" by taking "advantage of the COIVD pandemic to defraud people"; expressed "little … remorse" for his actions; and engaged in "significant, shocking" and "despicable" "misconduct" of "personally and intentionally attack[ing] [SEC] investigators trying to stop [his] fraud scheme," a level of wrongdoing the district court "rarely see[s] even with hardened criminals." A562-563. Those factors, the court said, "frankly suggest[ed] that a sentence near the top of the statutory maximum would be appropriate." A565. But "[o]n the other hand," the court recognized, there were "several significant mitigating factors" to consider, including the court's "belief" that Berman had initially "hoped to develop a [real] COVID test," and that Berman was an elderly man with serious health conditions. A565.

52

Accordingly, even if the district court applied the wrong Guidelines to Berman's offense, its error was harmless. "In the sentencing context, an 'error is harmless if the error did not affect the district court's selection of the sentence imposed.'" *United States v. McIlwain*, 931 F.3d 1176, 1185 (D.C. Cir. 2019) (quoting *Williams v. United States*, 503 U.S. 193, 203 (1992)) (punctuation omitted). In light of the court's thorough consideration and explanation of the unique aggravating and mitigating factors underlying its sentence, and its express declaration that it "would still issue the same sentence even if [it was] wrong about the [G]uideline[s] range," A566, there can be no doubt that the Court would have issued an 84-month sentence regardless of which Guidelines range applied to Berman's offense.[5]

---

[5] For the same reasons, even if Berman's other loss-related contentions are correct, and the district court erred in determining that Berman caused roughly $28 million in loss, any such error was harmless to Berman. Furthermore, Berman's second argument concerning the court's purported legal misinterpretation of the Guidelines (*i.e.*, that the district court wrongly assumed that a fraud's disclosure must always immediately follow its conclusion), which receives plain error review, fails because Berman cannot show "a reasonable likelihood [the error] impacted the sentence" and thus cannot show that the "error affect[ed] [his] substantial rights." *Mack*, 841 F.3d at 526.

### 2. Berman's term of 84 months' imprisonment would have been substantively reasonable even under the lower Guidelines range he urges

Finally, Berman fails to show that his sentence of 84 months' imprisonment was substantively unreasonable even if the district court should have applied a Guidelines range of 6 to 12 months' imprisonment.

In considering the substantive reasonableness of a "sentence … outside the Guidelines range," this Court "may consider the extent of the deviation, but must give due deference to the district court's decision that the [18 U.S.C.] § 3553(a) factors, on a whole, justify the extent of the variance." *Gall*, 552 U.S. at 51.[6] And "that [an] appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Id.*

The district court soundly concluded that Berman's sentence was supported by the factors of 18 U.S.C. 3553(a). For instance, as just explained,

---

[6] The 18 U.S.C. 3553(a) factors include "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and] (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *In re Sealed Case*, 809 F.3d 672, 676 (D.C. Cir. 2016) (quoting 18 U.S.C. 3553(a)(1)-(2)).

the Court went to great depths to recount Berman's "history and characteristics," and the "nature and circumstances of [his] offense," 18 U.S.C. 3553(a)(1). *See supra* p. 52. Moreover, the court declared that its "significant sentence [was] necessary to recognize the severity of [Berman's] misconduct," *see* 18 U.S.C. 3553(a)(2)(A), and "to deter others from engaging in this type of egregious fraud scheme," deeming it necessary "to send a clear message that [this] type of crime will be punished severely" because of "how vulnerable we as a country are to fraud during disaster circumstances," *see* 18 U.S.C. 3553(a)(2)(B), (C). A565-566. In addition, the court made clear that it had "carefully considered the unwarranted sentencing disparity arguments" that Berman had presented and found them "not all that relevant given the specific and unusual factors in this case." A565; *see* 18 U.S.C. 3553(a)(6). For these reasons, the court more than justified its decision to sentence Berman to 84 months in prison, even if his Guidelines range had been much lower. *See United States v. Miller*, 35 F.4th 807, 819 (D.C. Cir. 2022) (rejecting defendant's substantive reasonableness challenge to upwardly variant sentence of life imprisonment where district court "properly considered the purposes of criminal sentencing" as provided by 18 U.S.C. 3553(a)(2) and had noted that defendant's offense had "caused greater-than-usual harm.").

Berman provides nothing for why this case qualifies as the "unusual" one susceptible to reversal on substantive reasonableness grounds. *Gardellini*, 545 F.3d at 1096. At most, he cites to three out-of-circuit cases, which he portrays as signifying that a substantially above-Guidelines sentence must always be substantively unreasonable. But as just explained, that is not true; to the contrary, courts may not even presume that an above-Guidelines sentence is unreasonable. *Id.* And the cases Berman cites— *United States v. Tolbert*, 482 F. App'x 507 (11th Cir. 2012) (per curiam) (unpublished); *United States v. Martinez*, 821 F.3d 984 (8th Cir. 2016); *United States v. Seabrook*, 968 F.3d 224 (2d Cir. 2020)—are in any event far afield as none of them involved declarations from the district court that it "would still issue the same sentence even if [it was] wrong about the [G]uideline[s] range," or that the defendant's misconduct was "despicable," "shocking," and of a sort "rarely" exhibited by "even … hardened criminals." A562-563, 566.

56

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment of the district court.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
District of Columbia

BRENT S. WIBLE
Principal    Deputy    Assistant
Attorney General

JEREMY R. SANDERS
Assistant Chief &
Appellate Counsel
Criminal Division,
Fraud Section

LISA H. MILLER
Deputy    Assistant    Attorney
General

ETHAN A. SACHS
Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 353-1028
ethan.sachs@usdoj.gov

January 13, 2025

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25(d), the undersigned counsel of record certifies that the foregoing Brief for the United States was this day served upon counsel for appellant, by notice of electronic filing with the District of Columbia Circuit CM/ECF system.

DATED: JANUARY 13, 2025

s/ Ethan A. Sachs
ETHAN A. SACHS
Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 353-1028
ethan.sachs@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 11,529 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Century 14-point font in text and Century 14-point font in footnotes.

3. This brief complies with the privacy redaction requirement of Fed R. App. 25(a)(5) because it contains no personal data identifiers.

4. The digital version electronically filed with the Court on this day is an exact copy of the written document to be sent to the Clerk; and

5. This brief has been scanned for viruses with the most recent version of McAfee Endpoint Security, version 10.7, which is continuously updated, and according to that program is free of viruses.

DATED: JANUARY 13, 2025

s/ Ethan A. Sachs
ETHAN A. SACHS
Appellate Section
Criminal Division
U.S. Department of Justice
